Filed 6/26/13  P. v. Beltran CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT BELTRAN,<br><br>    Defendant and Appellant. | B242305<br><br>(Los Angeles County<br>Super. Ct. No. VA122934) |


APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed.

C. Bradford Law Firm and Caycie D. Bradford, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Robert Beltran appeals from the judgment entered following his convictions by jury on count 1 – assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), count 2 – leaving the scene of an accident (Veh. Code, § 20001, subd. (a)), and count 4 – second degree robbery (Pen. Code, § 211).  The court sentenced appellant to prison for two years.  We affirm the judgment.

## FACTUAL SUMMARY

1.  *People's Evidence.*

    a.  *Gustavo Jara's Testimony.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established that sometime after 6:30 a.m. on Friday, October 14, 2011, Gustavo Jara was at the World Mission Maranatha Church (church) in Bellflower.  Jara, through a Spanish interpreter, testified as follows.  Jara was leading a prayer service at the church from 5:00 a.m. to 7:00 a.m.  Jara testified he was "a minister in charge of . . . that schedule."  Jara was in charge of the church, had keys to open or lock the church, and testified he was "responsible for all the contents or personal belongings of that church, that date."  Jara was responsible for anything taken off the church premises during "[his] shift."  Jara also testified it was his "responsibility to take care of those things that belong to God."  Jara was casually dressed and wore nothing indicating he was a minister.

Part of the charitable work the church performed required it to recycle cans and bottles, and to sell them to raise money.  About 6:30 a.m. or 7:00 a.m. on October 14, 2011, Jara exited the church and saw appellant in the church parking lot near the bags containing recyclables.  The bags were maintained next to the trash dumpster.  The recyclables belonged to the church and were not trash.

When Jara saw appellant, appellant was putting black bags containing recyclables in appellant's car.  Appellant reentered his car and began driving slowly towards the exit.  Jara confronted appellant and stood in front of the car.  Appellant slowly approached Jara, then stopped.  Jara "told [appellant] to please pull the bags out of the car."  Jara did

2

not yell at or threaten appellant. When Jara spoke with appellant, Jara spoke in English. During cross-examination, Jara testified he understood some things that appellant's counsel was saying in English. Appellant and Jara were the only two people in the parking lot.

Appellant exited the car, removed one bag from the front passenger side of the car, and put that bag on the ground. Jara saw other bags in the car. Appellant said, " 'You know what, fuck you' " and reentered his car. When appellant reentered his car, Jara was not yelling and Jara was not screaming for other people. Appellant was already in the car when Jara began screaming for other people to come out of the church.

Jara testified appellant "gassed the car" and Jara jumped on its hood. Jara later testified, "I got in front, and then he stopped, and I slid back and I put my left leg in front, and then he gassed again, and he hit me in the knee." The following then occurred: "Q He gassed, meaning he moved forward with the car? [¶] A Yes, towards me."

Jara also testified that the first time appellant moved towards Jara, Jara was in front of the car and had to jump on the car. Jara jumped on the car to try to stop appellant. Appellant stopped and Jara slid down, landing on his feet. When Jara landed on his feet, they were about a foot from the front of the car. Neither Jara nor appellant said anything to the other. Appellant "gassed again" and hit Jara's knee. Jara was trying to stop appellant from taking the cans.

After appellant hit Jara's left knee, appellant drove backwards about 12 feet. Appellant then "gassed again, really fast" and moved towards Jara as appellant was leaving. Jara had to move out of the way. The spinning of appellant's wheels left a tire mark on the parking lot pavement. Appellant drove out to the street. Appellant's car was full of bags of recyclables. Jara did not give appellant permission to take them. The recyclables appellant took were never returned to Jara. On October 16, 2011, Jara went to the hospital and was given medication for pain in his left knee. During cross-examination, Jara testified that appellant "gassed forward and he braked and he hit me on

3

the knee." Jara was in front of the car and the center of the car struck him. Jara had no idea how fast appellant was going.

        b. *Raphael Diaz's Testimony.*

Raphael Diaz, through a Spanish interpreter, testified as follows. Sometime after 6:30 a.m., Diaz was at the church. Diaz was a member of, and worked at, the church. Jara was leading a prayer service there. Diaz considered Jara to be a person who took his "job" seriously, and Jara took his "position" seriously. Diaz testified Diaz "likewise [took Diaz's] . . . position as a church employee" seriously. The recyclables were kept on one side of the dumpster, and a wall separated the recyclables from the dumpster. No signs prohibited the taking of the recyclables.

During the service, Jara called for Diaz to come out of the church and, when Diaz complied, Diaz saw Jara in front of the car. Appellant was the car's driver. Jara and appellant were talking in English. Diaz said nothing to appellant. Diaz was about 13 feet from Jara and appellant. No one else was there. Diaz heard Jara tell appellant, in English, "to leave the things he was taking." Diaz understood very little English and did not speak English. Jara did not appear to be angry or upset. Diaz did not have a weapon in his hand.

Jara got on the car's hood and appellant started the car. Appellant backed up the car for a few seconds, went forward about six inches, and braked. Jara slid off and fell. Appellant "went to the side" and hit Jara's left knee. Appellant backed up, swerved around Jara, and left a skid mark on the pavement. Diaz did not try to stop appellant from leaving, but Diaz ran to close the gate. Appellant drove away quickly.

Diaz testified the incident of October 14, 2011, was the third time appellant had been at the location but the second time Diaz had seen appellant take cans. The first time Diaz saw appellant take cans occurred about September 14, 2011. About 8:00 a.m. on the latter date, Diaz was coming to church. Appellant was at the location of the recyclables. Appellant had "gone in there to take recyclables out" and was reentering his car. When appellant saw Diaz, appellant entered appellant's car and left quickly.

4

Diaz followed appellant, the two eventually stopped, Diaz questioned appellant, and appellant said "that [appellant] had taken the recycling." The following occurred: "Q Did you identify yourself as being somebody from the church on that occasion? [¶] A I tried to say to him, but he got upset -- and he was speaking in English and I only understood what he said, that he had taken the recycling from there, the church." Diaz reported the incident and the car's license plate information to the church office that same day, but "they said for what [appellant] had taken, they didn't want [any more] problems."

c. *Additional Testimony.*

A police officer who went to the scene on October 14, 2011, testified he saw skid marks in the middle of the church parking lot between the parking lot's north entrance and the south part of the property. The officer also saw redness, swelling, and a small contusion about three inches in diameter just below Jara's left kneecap.

2. *Defense Evidence.*

Beltran testified as follows. Beltran and his girlfriend went to churches that had food banks, and people distributed fliers pertaining to different food banks. The church at issue had food banks every third Saturday. On a Saturday perhaps four months prior to October 14, 2011, appellant and his girlfriend drove to the church. There was no food bank occurring on said Saturday but appellant and his girlfriend saw bags containing recyclables. Beltran testified, concerning the above previous occasion, that "They looked like bags of trash and recyclables and we assumed they were throwing them away." Appellant believed they were "recyclables for the taking." Appellant parked in plain view in the church parking lot and took three bags of recyclables. Appellant and his girlfriend returned every month thereafter towards the end of the month.

About September 14, 2011, someone confronted appellant when appellant left the church parking lot. On that occasion, a truck entered the parking lot as appellant was exiting. Appellant drove down various streets and the truck followed. Appellant eventually pulled over and asked the truck's driver, " 'What's up?' " Appellant testified

5

he was pretty sure the truck's driver was Diaz. In very broken English, the truck's driver asked, "Did you get those from the church?" Appellant testified he replied yes, Diaz left, and "[t]hat was it." No one had ever confronted appellant in the parking lot before October 14, 2011.

Between 6:00 a.m. and 7:00 a.m. on October 14, 2011, appellant drove into the church parking lot. The bags containing the recyclables were right next to a dumpster and were in trash bags. The following occurred during cross-examination: "Q Those bags belonged to somebody else besides you? [¶] A Oh, yes. They were recyclables. We didn't want to see the recyclables being wasted. They are recyclables. That's why we have recyclable dumpsters."

Appellant put in his car three bags of cans.[1] Appellant guessed he was there about 20 minutes. Someone then confronted appellant as follows. When appellant was preparing to leave, he saw a man by a van. Appellant testified that appellant was driving very slowly when he approached the man, and "[i]f I had seen him, I would have tried to fly out of there."

Appellant looked away for a moment and the next thing he knew, the man, i.e., Jara,[2] was opening the rear door on the driver's side of appellant's car. Appellant did not know who Jara was. Jara was saying something in Spanish while pointing to the cans. Appellant understood very little Spanish and did not speak Spanish. Jara was dressed in a "long sleeve thermal" and jeans, and his hair was disheveled.

Appellant figured Jara had something to do with the cans and that maybe Jara wanted them. Appellant turned off the car and exited it. Appellant asked Jara, " 'Is it the cans? Is this what you want? I'll give you the cans.' " Appellant then said, " 'Just don't hurt me.' "

---

[1]   About two months after the present incident, police arrested appellant. In a written statement to police, appellant said he unloaded his vehicle with five or six bags.

[2]   During appellant's testimony, he frequently referred to this "man," but also referred to him as Jara. Hereafter we refer to the man as Jara.

6

Appellant grabbed the cans from the rear seat. As appellant was setting them down, Jara looked to appellant's right. Appellant believed something was happening that had nothing to do with the cans. Jara began running to the front of the car and yelling, " 'compro, compro, compro, otro compadres, rapido, rapido.' " Jara was running in front of appellant's car and screaming loudly for Jara's friends. Appellant, talking only to himself, said, " 'Fuck that' " and that he better get out of the situation.

Appellant jumped in his car. Jara was in front of it. Appellant saw a second man move quickly by appellant's wing window and run towards the gate. Appellant thought the two men were trying to trap him. Appellant was afraid. He had undergone major surgery a month before and he could not use his arm.

Appellant turned on his car's ignition and, three times, yelled at Jara to get out of the way. Jara turned around and looked at appellant. Appellant saw the second man, and appellant turned his wheel all the way to the left. Appellant's counsel asked if Jara "kind of [got] on the hood of your car," and appellant replied, "He was like butted up" against the hood and was "standing up against the bumper part."

Appellant tried to back away from Jara. Appellant testified, "I nudged a couple of times. I backed up, backed up. He just kept walking on my car getting farther up against there." (*Sic*.) Appellant saw the second man reach the gate. Appellant put the car in first gear and told Jara to get out of the way. Appellant turned the steering wheel hard to the left, moved the car forward, "and it moved [Jara] out of the way." Appellant testified, "I don't know if he hit the car or what, because I thought I had distance to get away from him. [¶] So he might have rolled on the corner of the car."

Appellant finally accelerated after he nudged past Jara. Appellant was behind a speed bump. His car flew in the air, then straightened out. When he landed he heard a thump near the passenger side of the car, and did not know if Jara was kicking it. Appellant passed the second man as the latter was closing the gate. The car was moving pretty fast.

7

Jara never identified himself. If Jara had identified himself, appellant would have returned the recyclables. Appellant did not know where Jara or the second man had come from; they might not have come from the church. Appellant thought that perhaps Jara and the second man were angry because they, too, collected cans and appellant had encroached upon their territory.

Appellant was happy no one was hurt. Appellant did not intend to hit anyone, tried to avoid Jara and had not wanted anyone to get hurt. Appellant denied hitting Jara with the car but appellant also testified appellant could not tell if appellant had hit him. Appellant drove the car willingly, intentionally turned his steering wheel to the left, and intentionally tried to leave.

## ISSUES

Appellant claims (1) the trial court erroneously denied his *Marsden* motion, (2) there was insufficient evidence appellant committed robbery, (3) there was insufficient evidence appellant committed assault with a deadly weapon, and (4) judicial bias deprived appellant of a fair trial.

## DISCUSSION

1. *The Trial Court Properly Denied Appellant's Marsden Motion.*

On January 23, 2012, the court arraigned appellant and appointed Gregory Gonzales as his counsel. At all times herein mentioned, Gonzales represented appellant. The court repeatedly continued the case until May 21, 2012, when the parties announced ready for trial and the court trailed the case to May 22, 2012, for jury trial.

On May 22, 2012, Judge Michael L. Schuur called the case and the following later occurred: "[The Court:] And, [appellant], you wanted to tell me something about your attorney before I send the case out; is that right? [¶] [Appellant]: Yes."

After the prosecutors left the courtroom, the following occurred: "[The Court:] What did you want to tell me, [appellant]? [¶] [Appellant]: I'm having a problem with my attorney. [¶] The Court: What's the problem? [¶] [Appellant]: He's considering me, basically, guilty of this charge. And I keep telling him that it has nothing do [*sic*]

8

with that. . . . every time I present him with new information he's like, oh, I didn't see that. I didn't know that. It's all stated by all the victims exactly in their statements. It's black and white to read it. And he hasn't read the statements every time I present him with information."

The following then occurred: "[The Court:] Have you read all the discovery, [Gonzales]? [¶] [Gonzales]: Yes, I have. [¶] The Court: Do you have any confusion at all about what's going on? [¶] [Gonzales]: No. I think [appellant] has confusion. [¶] The Court: The motion under *Marsden* is denied." The court ordered the case transferred to Judge John Torribio for trial.

Shortly thereafter, appellant advised Judge Schuur that, the day before, a new charge had been added to the information. Appellant asked for a continuance to permit him to investigate the charge. The court replied, "No. Because your attorney said it falls under the same fact pattern. So, he's not surprised by it."

Appellant claims the trial court failed to conduct an adequate *Marsden* inquiry and hearing. We disagree. " 'In [*Marsden*], we held that a defendant is deprived of his constitutional right to the effective assistance of counsel when a trial court denies his motion to substitute one appointed counsel for another without giving him an opportunity to state the reasons for his request. A defendant must make a sufficient showing that denial of substitution would substantially impair his constitutional right to the assistance of counsel [citation], whether because of his attorney's incompetence or lack of diligence [citations], or because of an irreconcilable conflict [citations]. . . . [Citation.]' [Citation.]" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1127-1128 (*Mungia*).)

A "*Marsden* hearing is not a full-blown adversarial proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement." (*People v. Hines* (1997) 15 Cal.4th 997, 1025.) "[A]n appropriate inquiry under *Marsden* . . . requires that a trial court 'listen[] to [a defendant's] reasons for requesting a change of attorneys.' [Citation.]" (*People v.*

9

*Gutierrez* (2009) 45 Cal.4th 789, 804.) The matter is generally within the discretion of the trial court. (*Mungia*, *supra*, 44 Cal.4th at p. 1128.)

In the present case, appellant, in response to the court's question, indicated he wanted to tell the court something about Gonzales. After the prosecutors left the courtroom, the court twice inquired of appellant, asking him what he wanted to tell the court, then asking what the problem was. Appellant asserted in conclusory fashion that Gonzales "considered" appellant "basically, guilty of this charge." Appellant then essentially complained that appellant had to inform Gonzales about portions of the victim's statements because Gonzales allegedly had been unaware of those portions.

As for appellant's assertion Gonzales considered appellant "basically, guilty of this charge," appellant provided no foundation, e.g., information as to whether, or when, Gonzales said that, in what context, or the "charge" to which Gonzales allegedly referred. Appellant's assertion did not make clear whether it represented appellant's conclusion or a statement made by Gonzales. On the other hand, Gonzales announced he was ready for trial and suggested appellant was confused. Appellant makes no claim that any opinion held by Gonzales about appellant's guilt affected Gonzales's representation of appellant. Even if appellant's assertion were true, trial counsel can be expected to provide an independent evaluation of the charges, applicable law, evidence, and the risks and probable outcome of a trial. (*In re Alvernaz* (1992) 2 Cal.4th 924, 933.) The fact appellant may have been disappointed by Gonzales's alleged assessment of the strength of the People's case does not establish inadequate representation or an irreconcilable conflict.

As for appellant's assertions about the state of Gonzales's preparedness for trial, again, appellant provided no foundation, e.g., when, or in what context, the alleged conversations occurred during which appellant and Gonzales allegedly discussed the portions of the victims' statements. Nor did appellant specify what the contents of those portions were or why they were relevant.

10

On May 22, 2012, Gonzales, in response to the court questioning, stated he had read all the discovery, denied he was confused, and suggested appellant was confused. The court denied the *Marsden* motion. Appellant later felt free to raise the issue of a continuance; his failure to press the *Marsden* issue further suggests he was satisfied by Gonzales's representation that Gonzales had read all of the discovery. We note that, after the court denied the *Marsden* motion, the court indicated that Gonzales, prior to the motion, had commented to the court that the new charge fell under the "same fact pattern." This apparently was a reference to the fact pattern of the other offenses, and Gonzales's comment provides additional evidence Gonzales had been ready for trial. The trial court did not abuse its discretion by denying appellant's *Marsden* motion.

2. *There Was Sufficient Evidence Appellant Committed Robbery.*

The jury convicted appellant of robbing Jara (count 4). Appellant claims there is insufficient evidence of robbery because there is insufficient evidence Jara possessed the property taken. We reject appellant's claim. Appellant does not expressly dispute that on October 14, 2011, before appellant first approached the recyclables, the church owned and possessed them, and had not abandoned them. Instead, appellant argues Jara did not constructively possess them. We disagree.

For purposes of robbery,[3] possession may be actual or constructive. (*McKinnon, supra,* 52 Cal.4th at p. 687.) " '. . . [A]ll employees on duty have constructive possession of their employer's property and may be separate victims of a robbery.' [Citation.] In addition, 'persons other than employees may be robbery victims if they have a " 'special

---

[3]    " 'Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." [Citations.] A defendant who does not use force or fear in the initial taking of the property may nonetheless be guilty of robbery if he uses force or fear to retain it or carry it away in the victim's presence. [Citations.]' [Citation.] That is, '. . . robbery occurs when defendant uses force or fear in resisting attempts to regain the property or in attempting to remove the property from the owner's immediate presence regardless of the means by which defendant originally acquired the property.' [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 686-687 (*McKinnon*).)

11

relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." [Citation.] Formulated another way, the question is whether the prospective victim "may be expected to resist the taking." [Citation.]' [Citation.]" (*Ibid*.) When reviewing appellant's sufficiency claim, our power begins and ends with the determination whether there is substantial evidence, contradicted or uncontradicted, to support the judgment. (*People v. Hernandez* (1990) 219 Cal.App.3d 1177, 1181-1182.)

In the present case, on October 14, 2011, before appellant first approached the recyclables, they were church property on church property. Jara was at the church. He was leading a prayer service from 5:00 a.m. to 7:00 a.m. That morning, he was "minister in charge of . . . that schedule." He was in charge of the church, had keys to open or lock it, testified he was "responsible for all the contents or personal belongings of that church, that date," and testified he was responsible for anything taken off the church premises during "[his] shift."

During cross-examination, Jara testified to the effect that when he was confronting appellant, Jara was "in charge of" the "facility." Jara also testified it was his responsibility to take care of those "things that belong to God." The jury reasonably could have understood Jara to mean by the latter testimony that, because Jara was a minister, he was responsible for taking care of church property, including the recyclables.

We conclude there was substantial evidence Jara was a church employee on duty on church premises and that, even if he was not, there was substantial evidence that Jara had a special relationship with the owner of the property, i.e., the church, such that Jara had authority or responsibility to protect the stolen property on behalf of the church, and Jara could be expected to resist the taking. There was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that Jara constructively possessed the recyclables on October 14, 2011, before appellant took them. None of appellant's arguments compel a contrary conclusion.

Appellant also claims there is insufficient evidence of robbery because there is insufficient evidence appellant harbored intent to steal. We reject appellant's claim. Robbery requires an intent to permanently deprive the person of property. (*People v. Marshall* (1997) 15 Cal.4th 1, 34.) Intent "is seldom established with direct evidence but instead is usually inferred from all the facts and circumstances surrounding the crime." (*People v. Lewis* (2001) 25 Cal.4th 610, 643.) This intent to steal may ordinarily be inferred when one person takes the property of another, particularly if it is taken by force. (*People v. Tufunga* (1999) 21 Cal.4th 935, 943 (*Tufunga*).) "The taking element of robbery itself has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165.)

We already have concluded Jara constructively possessed the taken recyclables owned by the church; the issue is whether appellant intended to steal them, or lacked that intent because, e.g., he believed they were trash or were available for the taking. The events of October 14, 2011, did not happen in a vacuum. Diaz testified that in September 2011, he had seen appellant taking recyclables from the church. Diaz testified without contradiction that when Diaz saw appellant on that prior occasion, appellant entered appellant's car and left quickly. The jury reasonably could have concluded appellant's hasty departure under the circumstances evidenced consciousness of guilt (see *People v. Hoang* (2006) 145 Cal.App.4th 264, 276) that he was wrongly taking recyclables. When Diaz later followed and confronted appellant, appellant acknowledged to Diaz that appellant "had taken the recycling from there, *the church*." (Italics added.) Even appellant testified that a person "confronted" appellant (and appellant was pretty sure that that person was Diaz).

On October 14, 2011, appellant asported the church's recyclables that Jara constructively possessed; therefore, there was sufficient evidence of intent to steal. (Cf. *Tufunga*, *supra*, 21 Cal.4th at p. 943.) Moreover, there was substantial evidence appellant asported the recyclables by force by hitting appellant's knee with the car when

13

appellant was trying to get away; this further demonstrates the sufficiency of the evidence of intent to steal. (*Ibid*.)

On October 14, 2011, the recyclables were not strewn haphazardly in a trash can or dumpster. They had been placed in separate plastic bags, facilitating their removal as recyclables. The bags were separated from the trash by a wall. The bags were in the church's parking lot. They had not been placed on a public sidewalk or on the street for removal or disposal. The jury reasonably could have concluded from these facts that it was *apparent to appellant* that (1) the bags belonged to the church and (2) had not been thrown away or abandoned.

The fact there may have been no signs prohibiting the taking of recyclables is not controlling; thefts frequently happen absent signs prohibiting takings. Appellant never testified fliers were distributed indicating recyclables were available for the taking at the church. Before appellant took the recyclables, he never asked permission to do so. Appellant did not testify he told anyone at the scene that appellant believed the bags were trash or were available for the taking.

During cross-examination, the prosecutor asked appellant if appellant knew "those bags *belonged to somebody else* besides you," (italics added) and appellant replied, "Oh, *yes*." (Italics added.) Appellant's further reply, "We didn't want to see the recyclables being wasted," did not negate the above italicized testimony.

An issue was whether appellant left with intent to steal or, as appellant maintained, in fear for his safety. The jury reasonably could have concluded the parties' testimony as to what happened at the pivotal juncture of the initial confrontation on October 14, 2011, was so dramatically different that either Jara and Diaz on the one hand, or appellant on the other, must have been fabricating, and the jury reasonably could have concluded appellant fabricated on this issue. (See *People v. Beyah* (2009) 170 Cal.App.4th 1241, 1249-1250.) The jury therefore also reasonably could have concluded appellant fabricated because he knew the bags were not his and he harbored intent to steal.

14

The parties' evidence as to why appellant left the scene after appellant removed the one bag from the car was conflicting. Jara testified that after appellant removed one bag from the car, appellant said, " 'You know what, *fuck you*' " (italics added), reentered the car, and began to leave. The jury reasonably could have concluded appellant's profanity evidenced defiant intent to steal. Appellant testified he used profanity only towards himself, and began to leave because Jara and Diaz were trying to trap appellant and appellant feared for his safety. The parties' evidence on this issue was so dramatically different that the jury reasonably could have concluded based on all the facts that appellant was fabricating because he knew the bags were not his and he harbored intent to steal. Moreover, the People's uncontradicted evidence was that neither Jara nor Diaz had a weapon. Although appellant testified that at one point Jara ran to the front of the car and yelled for help, the jury reasonably could have concluded there would have been no need for Jara to do this if, as appellant also testified, appellant had begun removing bags from the car.

Appellant testified he was driving very slowly when he approached Jara, and "[i]f I had seen him, I would have tried to fly out of there." Appellant used force when appellant drove the car into Jara's left knee. Appellant never testified he thought there had been a misunderstanding so he returned the recyclables. There was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that appellant harbored intent to steal on October 14, 2011, from the time he first seized the bags to the time he drove out of the parking lot with them. Appellant's citations to various portions of his testimony do not compel a contrary conclusion.

3. *There Was Sufficient Evidence Appellant Committed Assault With a Deadly Weapon.*

The jury convicted appellant of committing assault with a deadly weapon against Jara (count 1). Appellant claims there is insufficient evidence he committed the offense. He concedes "[i]n this case the deadly weapon was a motor vehicle" but argues there is insufficient evidence of an assault. We reject appellant's claim.

In *People v. Williams* (2001) 26 Cal.4th 779, our Supreme Court held that "assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will *probably* and directly result in the application of physical force against another." (*Id*. at p. 790; italics added.) The defendant "may not be convicted based on facts [the defendant] did not know but should have known." (*Id*. at p. 788.) "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur." (*Id*. at p. 790.) Moreover, "a defendant who honestly believes that [the defendant's] act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Id*. at p. 788, fn. 3.)

Based on the People's evidence, Jara initially stood in front of appellant's car and appellant, whom we have concluded was stealing recyclables, stopped the car and later exited it. After directing profanity at Jara, appellant subsequently reentered his car. Appellant "gassed the car" and Jara jumped on its hood. Given these facts, the jury reasonably could have concluded that when appellant "gassed the car," he intentionally drove it *towards* appellant in such proximity that appellant had actual knowledge of facts sufficient to establish that the act of so driving by its nature would *probably* and directly result in the application of physical force against Jara, whether or not, as ultimately was the case, Jara jumped on the hood.

Similarly, Jara testified he slid back, he put his "left leg in front," appellant "gassed again," and appellant's car hit Jara's left knee, causing a three-inch contusion and eventual medical treatment for the knee. Jara testified "gassed" meant appellant was moving the car forward, and Jara testified appellant moved the car towards Jara. The jury reasonably could have concluded Jara was lawfully trying to prevent appellant from driving away and stealing recyclables. The jury also reasonably could have concluded appellant intentionally drove the car towards Jara with actual knowledge of facts sufficient to establish that the act of so driving by its nature would *probably* and directly

16

have resulted in the application of physical force against Jara, e.g., the car hitting some portion of Jara's left leg. This is true whether or not, as ultimately was the case, the car hit Jara's left knee, and whether or not appellant braked in an unsuccessful effort not to hit appellant.

After appellant's car hit Jara's left knee, appellant moved the car back about 12 feet, "gassed again, really fast," and drove the car past Jara to leave. Appellant moved towards Jara as appellant was leaving, and Jara had to move out of the way. The spinning wheels left a tire mark on the parking lot pavement. The jury reasonably could have concluded that appellant, stealing recyclables, intentionally drove the car forward with actual knowledge of facts sufficient to establish that the act of so driving by its nature would probably and directly have resulted in the application of physical force against Jara, i.e., the car hitting some part of Jara's body, whether or not, as ultimately was the case, Jara got out of the way.

In each of the above three scenarios, whether appellant believed his acts were not likely to result in the application of force against Jara, and whether appellant harbored a specific intent to injure, is not controlling. We need not decide whether there was evidence of additional assaults. There was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that appellant committed assault with a deadly weapon against Jara.

4. *Appellant Received a Fair Trial.*

Appellant claims the trial court exhibited judicial bias, denying appellant his federal and state constitutional rights to a fair trial, to an impartial jury, and to counsel. We conclude otherwise. Appellant waived the issues he presents by failing to object below to the challenged actions of the trial court on the grounds he now urges. (Cf. *People v. Snow* (2003) 30 Cal.4th 43, 78 (*Snow*); *People v. Sanders* (1995) 11 Cal.4th 475, 531.)

17

As to the merits, trial judges have a duty "to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (Pen. Code, § 1044.) Trial courts are required to "exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be . . . ." (Evid. Code, § 765.) Trial courts also have the authority to question witnesses. (Evid. Code, § 775.)

We have reviewed the entire reporter's transcript of the trial, including the portions quoted by appellant in his brief as well as the numerous portions he has cited but merely characterized. The portions quoted by appellant reflect various trial court actions, including instances in which the trial court permitted the prosecutor to lead a witness or the trial court characterized the effect of a People's witness's demonstration regarding an exhibit. As respondent points out in respondent's brief by numerous characterized but unquoted citations to the record, the trial court evenhandedly made efforts to keep both the prosecutor and appellant's trial counsel from straying unduly from the mark.

The burden is on appellant to demonstrate error; it will not be presumed. (*In re Kathy P*. (1979) 25 Cal.3d 91, 102; *People v. Garcia* (1987) 195 Cal.App.3d 191, 198.) The trial record fails to demonstrate anything occurred other than a trial court's evenhanded exercise of reasonable control over modes of interrogation and the general trial proceedings, and appellant has failed to demonstrate judicial bias, that the trial court violated appellant's constitutional rights, or that he did not receive a fair trial. (Cf. *Snow, supra,* 30 Cal.4th at p. 78.)

*DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:


KLEIN, P. J.


ALDRICH, J.